## BURLING et al. v. NEWLANDS et al.*

### No. 14,592; January 5, 1895.

#### 39 Pac. 49.

**Trust—Charging Trust Estate.**—For the convenience of certain lenders and borrowers of money, who did their business through a bank, a firm of stock brokers were in the habit of giving their promissory notes, and securing themselves by bank stock and other collaterals delivered to them by the president of the bank. Subsequently the bank failed, and the president conveyed all his property to a trustee, to be applied by him to "such purposes and uses as he may deem best for our joint and several interests." By fraudulent representations that the stock and collateral paid by the stock brokers were worthless, the trustee induced them to pay to him $200,000, in consideration of his promise to pay all their outstanding notes, which promise he performed. Held, that the fraudulent representations by the trustee gave the stock brokers only a personal right of action against him, and that they could not charge the trust estate

*For subsequent opinion in bank, see 112 Cal. 476, 44 Pac. 810.

in his hands for such sum, since they were not creditors of the bank president, who created the trust.

**Limitation of Actions.—A Cause of Action for Fraud is not Taken Out** of the operation of the statute of limitations by the Code of Civil Procedure, section 338, subdivision 4, which provides that the statute does not begin to run until discovery of the fraud, where it appears that the slightest examination of the public records would have put plaintiffs in possession of the facts, and that they acquired their information on which the action was based by inquiry of their friends and acquaintances—a course open to them before the statute had run.

**Laches—Fraud.—Equity will not Entertain a Cause of Action Seeking** relief from an alleged fraud, where complainants could have informed themselves of the facts by the exercise of reasonable diligence, but delayed bringing suit for over ten years, and until after the death of all the participants in the transactions.

APPEAL from Superior Court, San Francisco County.

Action by Leonide H. Burling and others against Frank G. Newlands and Frederick W. Sharon to compel defendants to account as successors of William Sharon, trustee of the property of William C. Ralston, deceased. From a judgment sustaining a demurrer to the complaint, plaintiffs appeal. Affirmed.

Joseph M. Nougues for appellants; Wm. F. Herrin, J. M. Allen and H. L. Gear for respondents.

McFARLAND, J.—This action was brought to obtain an accounting of the alleged trust estate and property of William C. Ralston, deceased, which is averred to have been conveyed by him in his lifetime to William Sharon, also now deceased, and by said Sharon to the defendants herein, and for a decree that there be paid to plaintiffs, out of said property, the sum of $200,000 and interest. The plaintiffs are the executrix and executor of William Burling, deceased, and the assignee in insolvency of James W. Burling, an insolvent; and the defendants are Frank G. Newlands and Frederick W. Sharon, to whom the said William Sharon during his lifetime conveyed all his property in trust. Defendants demurred to the complaint on general and on several special grounds. Their demurrer was sustained by the court

below, and judgment was rendered for defendants; and plaintiffs appeal from the judgment.

The amended complaint occupies four hundred and twenty-six pages of the printed transcript; and we will not undertake to give here even a synopsis of such a lengthy document. We will state only such facts as will present a distinct view of the main epochs in the long historical narrative. William C. Ralston was cashier of the Bank of California from 1868 to 1873, and its president from 1873 to the time of his death, which occurred August 27, 1875. From 1869 to 1872 he employed William Burling, a stock broker, to negotiate loans; Burling giving his individual notes for the loans, and Ralston furnishing shares of the stock of the bank, and other collaterals, as securities for the money borrowed. In 1872, William Burling formed a partnership with James W. Burling under the firm name of Burling & Bro.; and thereafter, until Ralston's death, loans were negotiated in like manner through the agency of said firm. On August 26, 1875, the said bank failed; and on the next day Ralston died by drowning. At that time there were outstanding notes of said William Burling for loans negotiated as aforesaid in the amount of about $155,000; and there were notes of Burling & Bro. given for loans so negotiated in the amount of about $1,613,000. Before his death, and on the day of his death, Ralston executed a conveyance of all his property to said William Sharon, ''in trust to collect and receive the rents, issues, incomes, and profits thereof, and every part thereof, and to sell and dispose of the same on such terms and prices as he deems best, and to apply the same and the proceeds thereof, and of all the property hereby conveyed, to such purposes and uses as the said William Sharon may, in his judgment, deem best for our joint and several interests.'' On December 24, 1875, William Burling and Burling & Bro. made a contract with said William Sharon, under which they paid to Sharon $200,000, and assigned to him all claims against the estate of said Ralston upon said outstanding notes; and said Sharon, by said contract, undertook to assume all indebtedness upon said notes, and relieve said Burling and Burling & Bro. from all liability arising upon the same, which said undertaking by said Sharon he fully performed. The said Burlings and the said Sharon had been negotiating

about said contract nearly four months before its consummation. It is averred that the Burlings were induced to pay said $200,000 to said William Sharon by representations of the latter to them that the shares of bank stock held by them as security for their said notes were illegally over-issued stock, and worthless; that the other collaterals held by them were owned by strangers to these transactions, and had been surreptitiously taken from the bank; that Ralston's estate was insolvent; that they (the Burlings) would be holden for the whole amount of said outstanding notes without recourse to any security; that D. O. Mills and all the other officers and employees of said bank confirmed the truth of said representations; and that they, having no sufficient information on the subject, relied on said representations of Sharon, and were thus led to enter into said contract and pay said $200,000. And it is further averred that all these representations were false, and were by said Sharon "willfully, designedly, and fraudulently made for the purpose of cheating and defrauding them, said Burlings, as aforesaid, out of said sum of $200,000." A certain proportionate part of the $200,000 was paid by said William Burling, and the balance by the said Burling & Bro. William Burling died on July 15, 1877; and the partnership was wound up and settled in January, 1879. In August, 1877, the plaintiffs herein, Leonide H. Burling and Benjamin Burling, were appointed administratrix and administrator of said William Burling, deceased; and they pray that there be paid to them the proportionate part of said $200,000 and interest, which they allege to be due to his estate. In June, 1882, the said James W. Burling, formerly the other member of the said firm of Burling & Bro., became an insolvent debtor; and in June, 1886, the plaintiff Benjamin Burling was appointed his assignee in insolvency; and he prays that there be paid to him, as such assignee, the proportionate part of said $200,-000 and interest which he avers to be due the estate of said insolvent. The said William Sharon, on November 4, 1885, by deed of trust, conveyed in fee all his property, of every kind, to the defendants Newlands and Frederick W. Sharon; and on November 15, 1885, the said William Sharon died. The purpose of this action is to compel the defendants, as trustees under said deed to them from said William Sharon,

to account for all real and personal property, the title to which "the said Sharon received under and by virtue of said deed of trust made on the twenty-seventh day of August, A. D. 1875, by said W. C. Ralston to him, said William Sharon," and to have said property, "of the estate of said W. C. Ralston," applied to the payment of said $200,000 and interest. The action was commenced on the twenty-fifth day of October, 1886, which was about eleven months after the death of said William Sharon, and eleven years after the transaction upon which the suit is founded.

Respondents present various reasons why the judgment of the court below should be sustained, and appellants attack it from various standpoints; but, under the views which we take of the case, it is not necessary to discuss all the propositions argued by the respective counsel. In our opinion, if, upon the facts alleged, the Burlings had any cause of action at all, their remedy was a personal action against William Sharon to recover damages for deceit in procuring their payment to him of the $200,000 in the manner as alleged, or upon an assumpsit to refund the money, implied from a rescission of the contract under which it was paid, for fraud by Sharon in obtaining it. But this is not such an action The nature of the action is stated in the first sentence of the brief of appellants, as follows: "This action is brought to obtain an accounting of the trust estate and property of the late William C. Ralston, which was conveyed to the late William Sharon in trust, and if, upon such accounting, it be ascertained that the estate of said Ralston was solvent, that there be repaid to the plaintiffs. the sum of two hundred thousand ($200,000) dollars and interest thereon, being moneys paid on account of liabilities incurred for said William C. Ralston." No claim is made against the personal representatives of William Sharon, deceased, or against his estate.

The theory of the complaint is that the conveyance from Ralston to William Sharon was a deed of trust for the benefit of Ralston's creditors; that the Burlings were beneficiaries under such deed of trust; and that, as such beneficiaries, they can charge the present respondents F. W. Sharon and Newlands for the repayment of said $200,000 and interest, to the extent of the value of any property which they may have

belonging to said alleged Ralston trust estate. Now, in the first place, it is doubtful if said conveyance created a trust estate of which Ralston's creditors were the beneficiaries. It is not so expressed on the face of the instrument. But, assuming that there was such a trust estate, it does not appear that at the time of its creation the Burlings were creditors of Ralston. It appears that for the convenience of certain lenders and borrowers of money who did their business mainly through the Bank of California, and who were frequently unknown to the Burlings, they (the Burlings) were in the habit of giving their promissory notes, and securing themselves by taking bank stock and other collaterals. Why the Burlings did this, or what, if any, advantage accrued to them therefrom, does not appear. During the period of these transactions Ralston was either the cashier or president of the bank, and appears to have been its principal business manager. Whether or not his request to the Burlings to make these notes upon the securities furnished them was made in his individual capacity, or as an officer of the bank, does not clearly appear. It certainly does not appear from the facts stated that he entered into any personal obligation to the Burlings on account of said notes, or made any individual promise with respect to them. It is expressly alleged in the complaint that at the times of these transactions "said Wm. C. Ralston did not give . . . . to the said Wm. Burling, or to the said firm of Burling & Brother, any evidence of indebtedness from him, said W. C. Ralston." Facts are not averred showing that the Burlings were sureties for Ralston; neither is it averred that the said collateral securities were not sufficient to protect said Burlings. No charge of misconduct is made against Ralston; but, on the contrary, it is averred that all statements of William Sharon about the unlawful acts of Ralston, his insolvency, and the worthlessness of said securities, were false. Moreover, the Burlings assigned to William Sharon all claims arising upon said notes against the estate of Ralston. Therefore, whatever construction may be given to the said deed from Ralston to William Sharon, the appellants in this action have no present claim as beneficiaries thereunder. And it is very clear that they are not such beneficiaries with respect to the very thing sued for in this action, viz., the $200,000, which it is averred

William Sharon fraudulently induced the Burlings to pay him four months after the death of Ralston and the execution of said deed. It is averred that Sharon used the said $200,000 in paying off certain debts of Ralston, but we do not see that any importance attaches to that averment. It could make no difference whether he so used that particular money, or any other money which he may have had. From every point of view the case presents the same aspect; namely, that if any wrong was done the Burlings, under the facts alleged, it was a wrong done by William Sharon personally, and that the only remedy was a personal action against the said Sharon.

Moreover, we think that the action is barred by the statute of limitations, and is stale from laches. Of course, the statutory period has run two or three times unless the case is saved by the clause (subdivision 4) of section 338 of the Code of Civil Procedure, which provides that in an action based upon alleged fraud the statute does not commence to run until the discovery of the facts constituting the fraud. This action is founded upon the contract between the Burlings and William Sharon, made on December 24, 1875, which was an executed contract; and the statute commenced to run on that day, except so far as its running was delayed by a want of knowledge of the fraud by which said contract is alleged to have been procured. But "the means of knowledge are the same thing, in effect, as knowledge itself" (Wood v. Carpenter, 101 U. S. 143, 25 L. Ed. 807); and one who makes a charge of fraud for the first time, many years after its alleged perpetration, must show that within a reasonable time he has used due diligence to discover it, has followed up circumstances which would have put a prudent man upon inquiry, and has not slept upon his rights until the lapse of time and the death of parties charged with the fraud have destroyed the means of a full, fair, and satisfactory investigation in a court of justice. Moreover, in such a case the complaint must state facts from which it will appear to the court that ordinary prudence could not have discovered the fraud within the statutory period. "The circumstances of the discovery must be fully stated and proved, and the delay which has occurred must be shown to be consistent with the requisite diligence": Wood v. Carpenter, supra. Statutes of limi-

tation are in great part founded upon the probability that during the course of many years witnesses will die, and recollections of events long past will become indistinct in the memories of the living. In the case at bar sufficient facts are not stated to show that the alleged fraud could not, with requisite diligence, have been sooner discovered. There was great opportunity for discovering the fraud, if any such existed, before the contract between the Burlings and William Sharon was made. That contract was not made in a hurry. Sharon's representations, alleged now to have been false, were not immediately accepted as true and promptly acted upon. Negotiations were continued for four months. Ralston, as appears from the complaint, was widely known in business circles, and had been accredited with great wealth. It is averred in the complaint that he was perfectly solvent, and that he had real and personal property, which passed to Sharon under the deed, of the aggregate value of $9,000,000. It is averred, also, that he had real property of the value of $6,000,000. If that was the fact, and the Burlings really had a legal claim against Ralston, it is almost beyond comprehension why they did not discover it, if not before the $200,000 contract, at least before the death of William Burling, or before the lapse of the statutory period of limitation. The slightest examination of public records would have put them on the trail of the fact. It does not appear that they demanded an examination of the books, papers, etc., of Ralston. But no discovery was made, and it does not appear that any reasonable efforts were made for a discovery, of the alleged facts upon which this action rests until ten years after the date of the contract, and until after the death of said William Sharon. And it is averred that then "the means by which they obtained any information was by inquiring among their friends and acquaintances whether they (said persons) had any information relating to the dealings of said Sharon with said trust estate, and whether they had any information regarding the property which was conveyed by said Ralston to said Sharon in trust, as aforesaid." But such means were always within the power of appellants and the Burlings; and there are no sufficient facts alleged to show that the delay is "consistent with the required diligence": See Ang. Lim., secs. 187, 190; Hecht v. Slaney, 72

Cal. 363, 14 Pac. 88; Moore v. Boyd, 74 Cal. 167, 15 Pac. 670.

Moreover, apart from the question of strict statutory limitation, the claim of appellants is too stale to be enforced in a court of equity. "No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith, and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere when there has been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has accrued. The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transaction having become so obscured by time as to render the ascertainment of the exact facts impossible": Hammond v. Hopkins, 143 U. S. 250, 36 L. Ed. 134, 12 Sup. Ct. Rep. 418. In speaking of this rule, this court, in Bell v. Hudson, 73 Cal. 288, 2 Am. St. Rep. 791, 14 Pac. 791, said: "It is a material circumstance that the claim was not made until after the death of those who could have explained the transaction." In the case at bar, William Burling and William Sharon, "the principal participants in the transactions complained of," were both dead before the commencement of the action. It is quite apparent that no court could do "entire justice" in the premises without the testimony of William Sharon. Of course, if the suit had been commenced within a reasonable time, and William Sharon had died before his testimony could have been taken, the want of his testimony would simply have been one of those natural misfortunes which sometimes come to litigants. But William Sharon lived for ten years after the transaction complained of. William Burling died two years after the transaction, fully satisfied, as is averred, that it was a fair one. James W. Burling did business for several years afterward, and, until he became an insolvent, was also satisfied with the fairness of the transaction. There was perfect acquiescence by all parties for ten years, and while Sharon lived. It was not until he died, and his testimony was forever beyond human reach, that the claim of appellants grew

up and took the form of a suit against his successors. It is a claim which equity should not now entertain.

Under the foregoing views, we need not discuss the many other points made by respondents in support of the judgment. Judgment affirmed.

We concur: Garoutte, J.; Van Fleet, J.

HARRISON and FITZGERALD, JJ.—We concur in the judgment, upon the grounds last presented in the opinion of Mr. Justice McFarland.