**SEELIG et al. v. FIRST NAT. BANK OF CHICAGO.**

No. 14431.

District Court, N. D. Illinois.
Eastern Division.

March 25, 1936.

Nelson, Miller & Boodell, of Chicago, Ill., for plaintiff.

Winston, Strawn & Shaw, of Chicago, Ill., for defendant.

SULLIVAN, District Judge.

July 12, 1935, amended bill of complaint, entitled as above, was filed by the members of a noteholders' committee, under deposit agreement dated July 10, 1934 (Exhibit B), on their own behalf and on behalf of all noteholders of Barnhart Bros. & Spindler, similarly situated, against the First National Bank of Chicago.

The bill sets up that plaintiffs, called "committee," are citizens of the Southern District of New York, and that they hold $97,700 or upwards of principal of said notes, under the July 10, 1934, deposit agreement. That plaintiffs are vested with full legal title to said notes, and all rights and claims thereunder, and that the committee is registered as a protective committee, as provided by the Federal Securities Act of 1933 (as amended, 15 U. S.C.A. §§ 77a et seq.).

That this is not a collusive suit to confer jurisdiction on a United States court. That it is between citizens of different states, and exceeds $3,000.

That Barnhart Bros. & Spindler is a New Jersey corporation, called "Company" in this bill.

That defendant was organized under the National Bank Act (12 U.S.C.A. § 21 et seq.), and authorized to accept trusts, and is a citizen of Illinois, and resident of Chicago, called "Bank" in this bill.

That the Union Trust Company (the original trustee under the trust indenture), herein called "Trustee," was organized under the Laws of Illinois, and authorized to accept trusts. February, 11, 1929, the Union Trust Company was consolidated with First Trust & Savings Bank, an Illinois corporation. May 2, 1929, the name was changed to First Union Trust & Savings Bank, an Illinois corporation, authorized to accept trusts. July 17, 1933, consolidated with the First National Bank.

That on February 25, 1925, a trust indenture was entered into between the "Trustee" and the Barnhart Bros. & Spindler Company (Exhibit A), providing for the execution and issue by the company of its 6 per cent. serial gold notes in an amount not exceeding $1,000,000 coupon notes, registered as to principal only, dated April 1, 1925, payable at various maturities from April 1, 1926, to April 1, 1935, with interest at 6 per cent. payable semiannually, and to be certified by the Union Trust Company of Illinois, trustee.

That by accepting the trust the trustee undertook to prevent the "Company" from violating any of its covenants, set out in the indenture, and assumed the duty affirmatively to act promptly to prevent any such violation.

That the First National Bank, by the various consolidations, succeeded to the duties of the original trustee.

That in September, 1928, the Union Trust Company, trustee, was informed of a plan to transfer the company's assets to and to merge with the American Type Founders Company, a New Jersey corporation.

That the American Type Founders Company at all times held all the common stock of the "Company."

November 1, 1928, the Type Founders Company acquired all the preferred stock of the "Company" in pursuance of the merger plan, all of which was known to the Union Trust Company, Trustee.

April 4, 1929, contracts for the sale and operation of the "Company's" branch offices were entered into between the "Company" and the American Type Founders Company.

August 29, 1929, Barnhart Bros. & Spindler transferred all of its assets to the American Type Founders Company, which agreed to assume all obligations and liabilities of the "Company," which, at the date of sale, was a solvent corporation with a surplus of $600,000.

That the notes of the "Company" now held by plaintiffs were, at the time of the above transfer, merger and sale, outstanding and unpaid, as well as the notes of other noteholders.

That the Union Trust Company, Trustee, had knowledge of said sale, merger, and transfer, and consented to the same, which was a breach of the conditions of the Indenture.

That the sale and transfer jeopardized plaintiffs' security, as well as that of other noteholders. That the Trustee owed the noteholders an affirmative duty to protect their security; and that it failed to apply to a court of equity to enjoin said sale and transfer, thereby losing the lien and other rights of plaintiff and the other noteholders created under the indenture of trust. As a result 'the trust estate was dissipated in breach of the covenants of the indenture, which provided that the "Company" was not to transfer its assets; and also provided that the "Company" was to maintain a fixed proportion of assets to liabilities, as is fully set out in sections 5 and 8 of article III.

That subsequently the said several Trustees, with knowledge of the "Company's" breach of the conditions of the indenture, accepted and received from the American Type Founders Company funds with which to pay principal and interest on outstanding notes when due.

That a copy of the audit provided for in the indenture would have revealed the transfer, and would have put the Trustee on notice. If the audits were not furnished, then the Trustees were negligent in not demanding them, as the indenture provided.

Article V of the indenture provides that, in case default continues for ninety days after demand for performance, then that the Trustee may declare the principal and interest of all outstanding notes to be due and payable.

That the Trustees all failed, neglected, and refused to demand performance by the "Company" of its covenants, and failed to declare a default under the conditions of said indenture.

That under the indenture the Trustee had the sole and exclusive right to declare such default, and to institute any action for the benefit of the noteholders; but that the Trustee and its successors failed to fulfill their duties, or to compel payment of outstanding notes as a condition to such sale, merger, and transfer to the American Type Founders Company.

That the Trustees willfully and in bad faith failed to notify the noteholders of the sale, merger, and transfer, or the default under the conditions of the indenture, or the "Company's" breach in not maintaining ratios of assets and liabilities.

That plaintiffs and other noteholders had no knowledge or information of said default and breach, and could not assert their rights under the indenture.

That said Union Trust Company, by not notifying the noteholders of the sale and transfer, impliedly consented to and acquiesced in the breach of the conditions of the indenture, and violated its fiduciary duty to noteholders by participating in an act which it undertook under the indenture to prevent the "Company" from doing.

That the Trustees accepted funds from American Type Founders Company with which to pay the interest on "Company's" notes; and also with which to purchase outstanding notes, this all being a part of a plan to prevent a declaration of default under the indenture, and to prevent the noteholders from acquiring knowledge of the breaches of trust.

October 4, 1933, the American Type Founders Company filed a petition in bankruptcy in the United States District Court of New Jersey, which is still pending.

That plaintiffs were then for the first time informed of the transfer, merger, and sale to American Type Founders Company by the "Company."

On April 1, 1934, $138,500 of principal was due, and not paid. April 1, 1935, $146,100 of principal was due and not paid. All interest which was due subsequent to April 1, 1934, was not paid.

That the "Company" is now insolvent, and plaintiffs have no remedy against it, and any judgment against it would be worthless.

That, because of the transfer, merger and sale, and because of the wanton and willful neglect of the Trustees to enjoin the sale and transfer, to declare a default, or to notify the noteholders of said transfer, merger, and sale, the noteholders merely hold claims against the American Type Founders Company in bankruptcy, which claims are uncertain and doubtful. That the value of the notes has been impaired to the loss of plaintiffs and other noteholders in the sum of $284,600.

That, by reason of the gross neglect, bad faith, and breach of fiduciary duties of the Trustees, plaintiffs have suffered damage to the amount of $97,700 and interest thereon.

That the First National Bank of Chicago is liable because it assumed the liabilities of its predecessors in the trust.

That expense is necessary in obtaining and presenting evidence, and in preparing

the bill of complaint and the amended bill of complaint, including stenographers' and solicitors' fees, and plaintiffs should be reimbursed for this out of the funds, if any, restored by defendant.

That there are outstanding notes held by various persons throughout the United States, and only a representative suit will prevent a multiplicity of suits.

That plaintiffs have no adequate remedy at law.

Plaintiffs pray: (1) That the First National Bank make answer; (2) that an accounting be taken of all sums due from defendants to plaintiffs, and due others similarly situated; (3) that the accounts of defendant, and its predecessor trustees, in purchasing and canceling notes, be taken and stated; (4) that acts and deeds of defendant and its predecessors be examined and investigated; (5) that plaintiffs alleged to be damaged in the sum of $97,700, and interest, and other noteholders who intervene, be awarded damages; (6) that defendant, upon paying these damages, be subrogated to plaintiffs' claims against the bankrupt, the American Type Founders Company; (7) that plaintiffs be reimbursed for their costs in this cause, and that the same be a first lien on the sum recovered; (8) that all holders of these notes be permitted to join in the suit and to share in the expense of the same, and that all other noteholders be restrained from prosecuting suits involving the same subject matter; (9) that plaintiffs have such other and further relief as the circumstances of the case require.

September 10, 1935, defendant filed its motion to dismiss, setting up the following grounds in support thereof: (1) That this court has no jurisdiction; (2) that plaintiffs act in a representative capacity, and that it does not appear that the amount involved between each individual person and defendant exceeds $3,000; (3) that plaintiffs act for numerous persons whose citizenship is not set forth, and some of whom may be citizens of Illinois, in which case diversity of citizenship would be lacking; (4) the amended bill is uncertain as to whether this suit is brought for plaintiffs and all other noteholders, or whether recovery is limited to persons who may intervene; (5) the Bill fails to state a cause of action against the defendant; (6) that the bill fails to set forth facts on which to predicate liability of defendant, for the reason that section 4 of article IX of the trust indenture provides that "The Trustee shall not be answerable for any act, default, neglect or misconduct of any of its agents, representatives or employees"; (7) that it does not appear from the bill that defendant owed any duty or was under any obligation to do or perform the things charged in the Bill to be omissions of duty, because the trust indenture, section 1, article IX, provides that the trustee may assume that there has been no default unless notified to the contrary by one or more of the noteholders, and shall not be compelled to take action under any circumstances unless properly indemnified to its full satisfaction; (8) that it does not appear from the bill that plaintiffs have sustained any loss or damage as the result of the acts or omissions of defendant, therein alleged; (9) that it appears from the bill that plaintiffs' claim is barred both by laches and limitation.

Plaintiffs, residents and citizens of New York (members of a noteholders' protective committee holding the notes of Barnhart Bros. & Spindler, a New Jersey corporation), "on their own behalf and on behalf of all other holders of the notes of Barnhart Bros. & Spindler similarly situated, and who may become parties to this suit," filed their bill against the First National Bank of Chicago, an Illinois corporation.

The bill does not set out the names, citizenship, and residence of the "other holders of the notes" on whose behalf the suit was also brought. On this ground, and for the further reason that some of such persons may be residents or citizens of Illinois, defendant moves to dismiss the bill.

Equity Rule 38, 28 U.S.C.A. following section 723, provides as follows: "When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole."

The present suit appears to be in conformity with this rule. Foster's Federal Practice (6th Ed.) vol. 1, p. 703.

In Doan v. Consolidated-Progressive Oil Corporation (D.C.) 271 F. 12, 13, the court said:

"Saving certain well-recognized exceptions in which one person may sue in the name of another, persons may not be

joined as plaintiffs, but by their own act or with their knowledge or consent. Daniell's Ch. Pl. & Pr. (6th Am.Ed.) p. 190, note. It does not appear that the unnamed stockholders participated in, or had any knowledge of, the institution of this suit. It is a general rule in equity that 'all persons having an interest in the subject of the action and in obtaining the relief demanded may join as plaintiffs'; but it is likewise true that only those who actually complain and join in exhibiting the bill are plaintiffs. Story's Eq. Pl. § 26. In class suits, in which one or more persons sue for all persons similarly situated, the members of the class in whose behalf a bill is filed, but who do not join in the complaint and in exhibiting the bill, are not parties plaintiff. Story's Eq. Pl. 125a.

"Such is also the inevitable inference resulting from the decision and the language thereof in Stewart v. Dunham, 115 U.S. 61, 64, 5 S.Ct. 1163, 29 L.Ed. 329. Moreover, the Supreme Court there made it clear that, where persons sue in a representative capacity in a federal court, the jurisdiction of the court is dependent wholly upon the citizenship of the persons so suing, and not at all upon the citizenship of the other members of the class in whose behalf the suit is brought. When this case is read in connection with Ayres v. Wiswall, 112 U.S. 187, 5 S.Ct. 90, 28 L.Ed. 693, and Central Railroad Co. of N. J. v. Mills, 113 U.S. 249, 5 S.Ct. 456, 28 L.Ed. 949, which hold that all parties on one side of the controversy must be citizens of different states from those on the other, it becomes manifest that the members of a class in whose behalf a bill is filed, but who do not join in the complaint and in exhibiting the bill, are not considered by the Supreme Court as parties to a suit." Farmers' Loan Co. v. Elevated R. R. Co., 173 Ill. 439, at page 457, 51 N.E. 55.

As a further ground in support of its motion to dismiss, defendant urges that plaintiffs hold the notes solely for purposes of collection on behalf of others, and therefore it does not appear from the bill that the actual individual owners could sue in the federal court because their respective holdings are any of them in excess of $3,000.

The deposit agreement provides that title to the deposited notes shall remain in the respective depositors until the deposit committee shall elect to take title thereto.

January 25, 1935, by resolution unanimously adopted, the committee elected and did take title to all notes deposited under the deposit agreement of July 10, 1934.

June 7, 1935, the resolution was amended to the effect "that the committee thereby intended to take title to notes thereafter deposited, as well as to such notes as had previously been deposited."

The bill alleges that plaintiffs are the owners and holders of $97,700, of the notes of Barnhart Bros. & Spindler.

In the case of Bullard v. Cisco, 290 U. S. 179, at page 187, 54 S.Ct. 177, 180, 78 L.Ed. 254, 93 A.L.R. 141 (cited by both sides in the instant case), where a Bondholders' committee brought suit against the city of Cisco to recover the amount of bonds and interest issued by it, the court said:

"Under section 41(1), title 28 U.S.C. (28 U.S.C.A. § 41(1), two things were essential to the jurisdiction of the District Court—one, that the suit be between citizens of different states, and the other that the sum or value in controversy, exclusive of interest and costs, be in excess of $3,-000. It was shown and not questioned that the parties—the plaintiffs on the one hand and the defendant on the other—were citizens of different states. The suit was on bonds amounting to $14,000 and coupons amounting to $335,787.50—all payable to bearer, made by the defendant corporation and held by the plaintiffs—and recovery was sought of the full amount of these bonds and coupons. Thus both jurisdictional requisites were apparently present.

"But it is urged that a part of that which made for such apparent jurisdiction was not real but colorable only, in that the plaintiffs had no actual ownership of the bonds and coupons sued on, but held them solely for purposes of collection on behalf of others who severally were the actual owners but unable to sue in the federal court since their respective claims were too small to satisfy the jurisdictional requirement. If this were all true the conclusion would follow that the suit was not properly within the jurisdiction of the District Court and should have been dismissed under section 80, title 28, U.S.C. (28 U.S.C.A. § 80).

"On the other hand if the transfers whereby the plaintiffs came to hold the bonds and coupons were not merely colorable or simply for purposes of collec-

tion, but were real and intended to invest the plaintiffs with the full title, even though in trust for purposes of which the transferrers ultimately would be the chief beneficiaries, it is quite plain that the plaintiffs could sue in the federal court notwithstanding the several transferrers, by reason of their small holdings, may have been unable to do so. With one accord prior decisions of this Court show that the right of a transferee of corporate bonds and coupons, payable to bearer, to sue in a federal court, notwithstanding a disability of his transferrers in that regard, turns on the nature of the transfer— whether it be real or only a colorable device to enable the transferrers, through the favor and name of the transferee, to invoke a federal jurisdiction which they could not invoke in their own right. [Citing cases.]

"We are of the opinion that the purpose of the agreement of January 3, 1930, was not to create a mere collection agency, nor to set up a merely colorable device for circumventing restrictions on federal jurisdiction, but to put the bonds and coupons, the owners of which were numerous and widely scattered, into an express trust, to be managed and administered by four trustees, for the purpose of conserving, salvaging, and adjusting the investment; the municipal debtor having become financially embarrassed. The depositing owners, or succeeding certificate holders, were to be the cestuis que trustent or beneficiaries. The plaintiffs were to be the trustees. Although not called trustees in the agreement, they necessarily had that status by reason of the rights, powers and duties expressly assigned to them. There was a distinct declaration that they should have full title to the deposited bonds and coupons, and this was fortified by other provisions defining the control and power of disposal which the trustees were to have over them.

"Counsel for the defendant inquire— If the committee were to be the legal owners of the bonds and coupons, why were they authorized to borrow money and pledge the bonds and coupons for its repayment, as also to do other things which legal owners would be free to do without special authorization? The answer is obvious. The title and authority confided to the persons constituting the committee were confided to them as trustees, and not in their personal right, and there was need for carefully and fully defining the authority, for trustees are not permitted to go beyond such as is given expressly or by necessary implication.

"To summarize, we think it apparent from the agreement as a whole that resort to litigation was not the principal thing in mind when it was being made, and that what was intended was to invest the trustees with full title and such discretionary powers as might enable them to effect a helpful adjustment of the situation, through refinancing, composition, exchange of securities and other means, including litigation if needed.

"As the transfers under which the plaintiffs held the bonds and coupons were made to them as trustees, were real and not simply for purposes of collection, and invested them with the full title they were entitled, by reason of their citizenship and of the amount involved, to bring the suit in the federal court. The beneficiaries were not necessary parties and their citizenship was immaterial."

All of the jurisdictional requisites appear to be present in the instant case, and plaintiffs are entitled to bring their suit in the federal court.

Defendant next urges that the bill fails to state a cause of action against defendant.

The trust indenture in substances recites that it was made to provide for the issuance by Barnhart Bros. & Spindler of its 6 per cent. serial gold notes in the sum of $1,000,000, to be certified by the Trustee.

That the Company would promptly pay principal and interest at maturity at the office of the Trustee, where all notices and demands might be served upon it.

That it would maintain current assets in the ratio of at least 150 per cent. of the par or face value of the notes outstanding, and net tangible assets in the ratio of 200 per cent., and maintain current assets in the ratio of at least 150 per cent. of current liabilities. The indenture then defines current assets, liabilities, and net tangible assets, and provides that failure to so maintain would constitute default on the part of the Company.

The indenture also contains the usual clauses relative to default, providing that, in case the Company fails to pay any amount when due, the Trustee is entitled to institute, in its own name, any action at law or in equity to collect the same.

Article IX provides that when the word "Trustee" is used in the indenture it shall be construed to mean "the Trustee named herein or its successor, whether such succession is by way of reorganization, consolidation, merger, assignment of all its assets and business, or otherwise."

The bill of complaint alleges that by accepting this trust the Trustee undertook to prevent the Company from violating any of the covenant of the trust indenture, and affirmatively assumed the duty to act promptly to prevent any such violation.

That the Trustee had knowledge of and consented to the transfer and sale of the assets and business of the Barnhart Bros. & Spindler Company to the American Type Founders Company, which was a breach of the conditions of the Indenture.

That the sale jeopardized the security of plaintiffs and other noteholders, and lost to them the liens and other rights created under the trust indenture, which provided that the Company was not to transfer its assets.

That the Trustee, by not notifying the noteholders of the sale and transfer, consented to and acquiesced in the breach, and thus violated its fiduciary duty to the noteholders, who had no knowledge or notice of any of said transactions until the time when the American Type Founders Company went into bankruptcy.

That the Trustee, with knowledge of the Company's breach, accepted from the American Type Founders Company funds with which to pay the principal and interest of notes covered by the Trust Indenture.

That the Trustee did not demand the audits which the Trust Indenture provided for, and which, if supplied, would have put the Trustee on notice of the said sale and transfer.

That the Trustee willfully and in bad faith failed to notify the noteholders of the sale and transfer.

■ It is elemental that a Trustee named in a deed of trust securing a bond issue represents all of the bondholders, and is held to the greatest good faith. Continental & C. Trust & Savings Bank v. New Orleans Drainage Co. (D.C.) 278 F. 811.

■ "The trustee, independently of the provisions of the trust deed, has the power, and it is its duty, whenever the necessity arises, to invoke the aid of a court of equity to preserve the trust estate, and

this power cannot be abridged or restricted even by agreement of the parties." New York Trust Co. v. Michigan Traction Co. (D.C.) 193 F. 175, 180, and cases there cited.

■■ By its motion to dismiss defendant admits the truth of the allegations of the bill. The bill alleges that the Trustee was informed with regard to and had notice of a plan whereby the Company was to merge or consolidate with the American Type Founders Company, a corporation holding all of the common stock of the Company; and in pursuance of the consolidation plan also acquired all of the preferred stock of the Company. That the Trustee aided and assisted in the consummation of this plan, and willfully, wrongfully, and in gross neglect of its express and implied duties as Trustee, and in bad faith, acquiesced in and consented to such merger, sale, and transfer, without notifying the noteholders thereof.

That section 7 of article III of the trust indenture provides: "The Company covenants and agrees that so long as any note is outstanding hereunder it will not make or voluntarily suffer to be made any sale or lease, or contract for the sale or lease of all or substantially all its properties, rights, privileges and franchises, or any contract or agreement for the operation thereof, or any consolidation or contract of consolidation or merger."

That the merger, sale, and transfer were completed at a time when the Company was solvent, having a surplus of $600,000 on hand, and when plaintiffs' notes, as well as those of other noteholders, were outstanding and unpaid; and that the transfer and sale jeopardized plaintiffs' security.

That the Trustee had actual knowledge of this transfer and sale and consented to and acquiesced in the same, knowing it to be a breach of the provisions of the trust indenture.

That it was only at a much later date, when the American Type Founders Company filed its petition in bankruptcy, that plaintiffs for the first time learned of the merger and transfer and sale of the Company's assets.

The consent to and acquiescence of the Trustee in the sale and transfer of the Company's business and assets, which was prohibited by the trust indenture, and Trustee's failure to conserve the assets of the Company and protect the noteholders,

as charged in the bill, is something more than "the neglect or misconduct of its agents" against which the Trustee contracted for immunity.

In the case of Browning v. Fidelity Trust Co. (C.C.A.) 250 F. 321, 324, cited by defendant, the court said: "The plaintiff admits that as a general proposition parties creating a trust can, by their agreement, limit the liability which is imposed by one and accepted by the other, Tuttle v. Gilmore, 36 N.J.Eq. 617, but maintains, very properly, that the law, dictated by considerations of public policy, determines a point beyond which the parties cannot agree to relieve a trustee from liability for breach of a trust duty. For instance, a trustee cannot contract for immunity from liability for acts of gross negligence or for acts done in bad faith. Such contracts are invalid because repugnant to law."

The court then defines gross negligence and bad faith, thus:

"Gross negligence and bad faith are distinguishable. They are sometimes confused because gross negligence may properly constitute evidence from which bad faith may be inferred. 6 Corpus Juris, 881. Bad faith, though an indefinite term, differs from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with a furtive design or some motive of interest or ill will. It contains the element of intent to do wrong in some degree, actual or necessarily inferable. In contracts, it does not mean a breach of faith in the sense of a breach of an undertaking by failing to perform the undertaking. Lewis v. Holmes 109 La. 1030, 34 So. 66, 61 L.R.A. 274. Such a failure approaches negligence.

"The elemental idea of negligence is failure or omission—the failure or omission to do something which should have been done. Negligence that is gross involves the additional and affirmative element of intent to do or wilfulness with which is done the negligent act. The essence of gross negligence may be gathered from familiar definitions. It is defined to be 'the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another.' McDonald v. International Ry. Co. (Tex.Civ.App.) 21 S.W. 774, 775; Schindler v. Milwaukee Ry. Co., 87 Mich. 400, 49 N.W. 670; 'such a gross want of care and regard for the rights of others as to justify the presumption of wilfulness and wantoness,' 2 Thomp.Neg. 1264."

The neglect and misconduct complained of in the present case would seem to fall within the definition above quoted.

Defendant also urges that it was under no obligation to perform the things charged in the bill, the omission of which is complained of, because article IX, § 1, of the contract relieved it therefrom. Article IX, § 1, provides: "The Trustee may for all purposes of this Indenture of Trust assume, until it shall have received notice in writing to the contrary, signed by one or more persons believed by it to be the holders of notes issued hereunder, that there has been no default on the part of the Company; and it shall under no circumstances be compelled to take any action as Trustee under this Indenture of Trust unless properly indemnified to its full satisfaction."

There is no question as to the validity of the above provisions; but what plaintiffs complain of is their lack of information as to the activities of the Company while the Trustee was in possession of all such information, and was aiding in and consenting to the sale and transfer of Company's property and assets, which the trust indenture prohibited.

The bill sets out that the Trustee knew all of the facts, but that the noteholders did not, and that the Trustee withheld such knowledge from them; and that the noteholders were therefore relieved from giving the notice required under article IX, § 1. Frishmuth v. Farmers' Loan & Trust Co. (C.C.) 95 F. 5, affirmed (C.C. A.) 107 F. 169.

In Thompson v. Hays (C.C.A.) 11 F. (2d) 244, 250 (cited by defendant), the court there said: "The bondholders were fully advised of the situation at stated and proper times. There was no attempt to conceal anything from them."

Considering the high standing of the Bank, it is even reasonable to conclude that bonds were purchased largely on the faith of the bank being the Trustee.

Plaintiffs have sufficiently set forth a cause of action against the defendant. Continental & Commercial T. & S. Bank v. New Orleans Drainage Co. (D.C.) 278 F. 811.

Defendant also urges that plaintiffs' claim is barred by the statute of limitations as well as by laches.

Chapter 83, section 16, Smith-Hurd Ill.Stats., chapter 83, section 16, Ill.Rev. Stats.1935, provides: "All civil actions not otherwise provided for, shall be commenced within five years next after the cause of action accrued."

Longsdorf's Cyclopedia of Federal Procedure, § 412, c. 7: "There is no general Federal Statute of Limitations. From the beginning State Statutes of Limitation of action have been the rule of decisions in the Federal Courts in actions of the classes described in the State Statutes."

"For the sake of uniformity, the federal courts will accept state statutes of limitation whenever by so doing they are not required to abrogate their own principles." Pond Creed Coal Co. v. Hatfield (C.C.A.) 239 F. 622, 623.

"While a federal Court of chancery is not bound by a statute of limitations, it usually recognizes as of persuasive force the statute of limitations applying to cases of like character" and not violative of equity principles. Wells Fargo Nevada Nat. Bank v. Barnette (C.C.A.) 298 F. 689, 43 A.L.R. 916, affirmed 270 U.S. 438, 440, 46 S.Ct. 326, 70 L.Ed. 669.

Laches cannot exist unless and until the party has legal notice or knowledge of the facts affecting his rights, including knowledge of fraud. Fed. Procedure, ch. 9, § 678, and cases cited.

Statute of limitations or laches does not begin to run against the cestui que trust until he has knowledge of the breach. In Humble Oil & Refining Co. v. Campbell (C.C.A.) 69 F.(2d) 667, 671, the court said: "We think the rule invoked has no application here in the light of the paramount consideration which we have stated in the outset of this opinion, that here is a case of an express trustee deliberately defrauding his beneficiaries under conditions which the Humble Company knew in part in fact, and altogether in law, and of which the beneficiaries knew nothing. Here is a case of a continued concealment made possible by the acquiescence of the Humble Company. This acquiescence was manifested by a closing of the eyes to obvious facts, a shifting of the responsibility for obtaining the consent of the unit holders to the trustee who was going about to defraud them, and by an active consenting to his further spoliation in procuring a division order for oil runs belonging to the trust. Under these circumstances equity ought not to permit, and we think it will not, either limitation or laches to apply against those who, ignorant of the defrauding, have been unable to defend themselves. We think the principles laid down in Bailey v. Glover, 21 Wall. 342, 22 L.Ed. 636; Exploration Co. v. United States, 247 U.S. 435, 38 S.Ct. 571, 62 L. Ed. 1200, apply to prevent the company from asserting either limitation or laches against the suit."

Defendant's motion to dismiss is denied.